


**SO ORDERED.**

**SIGNED this 19 day of June, 2006.**

JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

**IN RE:**

| | |
|---|---|
| **RAMIRO VEGA** | **Case No. 06-40010** |
| **JANET ELLEN VEGA,** | **Chapter 13** |
| **Debtors.** | |

## MEMORANDUM ORDER AND OPINION

This contested matter is before the Court on the Objection to Confirmation filed by Universal Acceptance Corporation (UAC).[1] The issue is whether a creditor can require, pursuant to certain provisions of 11 U.S.C. § 1325(a) added by the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA),[2] that a Chapter 13 debtor pay more than the purchase price of a motor

[1]Doc. 23. UAC has also filed a Motion for Relief from Stay regarding the vehicle (Doc. 21), and Debtors have filed an Objection to UAC's Proof of Claim (Doc. 35).

[2]This case was filed after October 17, 2005, when most provisions of BAPCPA become effective. All future statutory references are thus to BAPCPA, 11 U.S.C. §§ 101 - 1532 (2005), unless other specifically noted. Any reference to the Bankruptcy Code as it existed prior to the 2005 amendments will be referred to as 11 U.S.C. § 101, et seq. (2004) or to "Pre-BAPCPA § 101 et seq.

vehicle purchased and pledged 15 day before the filing of bankruptcy, plus interest, when a now unsecured, antecedent debt is "rolled into" the promissory note.

## I. Facts

The parties have filed a Joint Stipulation of Facts,[3] which the Court adopts. Those facts are summarized as follows. Debtors executed a loan and security agreement with CarHop on April 8, 2004, and pledged a 2001 Kia as security for that loan. About 20 months later, on December 28, 2005, and just 15 days prior to filing the instant bankruptcy case, Debtors executed a second loan and security agreement, again with CarHop, for $8,789.98 (at 22.99%).[4] CarHop validly assigned its instruments to UAC on both loans, and UAC properly perfected its purchase money security interest (PMSI) in each vehicle contemporaneously with each loan transaction.

The second loan was expressly made for Debtors to purchase a 1996 Dodge Intrepid, and the only collateral pledged as security for this loan was the Intrepid. UAC specifically did not require Debtors to pledge the Kia as collateral for the second loan.[5] The "cash price," including sales tax, for the Intrepid was $6,763.98.[6]

The parties apparently agreed both that CarHop would release its lien on the Kia, and that the amount remaining due on that first note originally secured by the Kia ($2,123) would be "rolled

---

[3]Doc. 32.

[4]The Retail Installment Contract and Security Agreement attached to UAC's Proof of Claim filed in this case (Claim No. 12), indicates that the amount to be financed is $8,369.98. The difference of $420.00 appears to be a "deferred down payment."

[5]Although the parties have not stipulated to the value of the 2001 Kia, Debtors' Schedule B describes the property as a "2001 Kia Rio (does not run)" with a value of "$500."

[6]This fact is not contained within the parties' stipulation, but is included in the exhibits attached to UAC's Proof of Claim and is relevant to the Court's decision. If either side disputes this fact, they should immediately seek reconsideration on that issue, and the Court will likely set that issue for evidentiary hearing.

into" the new note. That agreement was consummated, in part, when the day after Debtors executed the second note, on December 29, 2005, UAC deemed the first loan paid by stamping "PAID IN FULL" on the note, and mailing that instrument to Debtors that same date. UAC never argues here that it has any interest in that Kia, and the only fact upon which the parties disagree is whether UAC formally released its lien on the Kia before, or after, Debtors filed their bankruptcy petition.

Debtors filed for bankruptcy protection on January 12, 2006 and simultaneously filed their Chapter 13 plan.[7] Notwithstanding their contention that the Intrepid's value is only $3,600, Debtors' Chapter 13 plan nevertheless proposes to pay $6,764—the agreed purchase price of the Intrepid, at $230 per month, plus "the discount rate of interest, or the amount of the debt, whichever is less..."[8]

As alluded to, above, UAC claims that it released its lien in the Kia, and mailed that release to Debtors by first class mail, on January 11, 2006, the day before the bankruptcy was filed. Conversely, Debtors contend they have no record of receiving any lien release before receiving the one that on its face indicates it was not executed until January 29, 2006, two weeks post-bankruptcy filing. This is not a case where the creditor claims the lien release was inadvertent; it intended to release the lien according to the agreement of the parties. Debtors never dispute this was the parties' mutual intent; they never argue that in negotiating the transaction, they intended for UAC to retain a security interest in the Kia to secure the amounts owed.

---

[7]Doc. 2.

[8]There is no stipulation on the value of the Intrepid, but attached to UAC's Proof of Claim No. 12 is a Kelley Blue Book worksheet for a 1996 Intrepid, showing if such vehicle is in "Excellent" condition, its probable retail value is $4,150. As the Court understands it, "Excellent" is the highest value a car receives in the Kelly Blue Book. Either this 9 year old car depreciated by more than 30% within 15 days of its purchase, or Debtors paid far more for the car than it was worth, at least according to the Kelley Blue Book. Regardless of the reason for this significant discrepancy between value and purchase price, Congress has decided, as a policy matter, under the BAPCPA revisions to the Code, that debtors should repay in a Chapter 13 the amount they actually agreed to pay for a motor vehicle purchased within 910 days of bankruptcy, instead of the true value of the collateral, which policy this Court must, of course, enforce.

## II. Jurisdiction

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (L), and this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).

## III. Conclusions of Law

Section 1325 establishes confirmation requirements for Chapter 13 plans, including the required treatment for secured creditors. As a preliminary matter, it must be remembered that § 1322(b)(2), which was not altered by BAPCPA, provides that a Chapter 13 plan may modify the rights of holders of unsecured claims and of secured claims "other than the holders of claims secured only by an interest in the debtors' principal residence."[9] UAC is the holder of a claim secured by a vehicle, so its rights can be modified, as provided by other sections of the Code, noted below.

Section 1325(a)(5) mandates that Chapter 13 plans, to be confirmable, must provide one of three alternative treatments to secured creditors. First, the plan can provide the secured creditor with whatever treatment the secured creditor has agreed to accept.[10] Clearly, UAC has not agreed to accept the treatment being provided it in the instant plan, so this alternative is not available to Debtors. Second, the plan can provide for the surrender of the collateral to the secured creditor.[11] Clearly, Debtors are not agreeing to surrender the Intrepid. The only other remaining option for Debtors, therefore, is that their plan must provide for them to retain the collateral while

[9] 11 U.S.C. § 1322(b)(2).

[10] *Id.* at § 1325(a)(5)(A).

[11] *Id.* at § 1325(a)(5)(C). Prior to the adoption of BAPCPA, the creditor would then sell the collateral, by definition receiving the liquidation value. The net amount received was then subtracted from the debt and the difference allowed as an unsecured claim in the debtor's chapter 13 plan. In this District, in the vast majority of plans, typically unsecured claims are ultimately discharged, once the plan is was completed, without any payment.

simultaneously providing the UAC, the secured creditor, with a stream of payments equal to the amount of the creditor's allowed secured claim.[12]

Along with this third option, the plan must provide a) that the secured creditor retain its lien until the earlier of the payment of the underlying debt pursuant to non-bankruptcy law or the issuance of a discharge, b) that the secured creditor retain its lien to the extent recognized by non-bankruptcy law if the case is dismissed or converted without completion of the plan,[13] and c) that the value as of the effective date of the plan of property to be distributed under the plan on account of the secured claim is not less than the allowed amount of such claim.[14] This section mandates that the secured creditor receive the present value of its claim as of the petition date. The Supreme Court has, pre-BAPCPA, interpreted this section to require the payment of interest on the secured claim at a rate determined by an adjustment from the prime rate based on the risk of nonpayment.[15]

The last requirement is that if the plan provides for periodic payments, such payments must be in equal monthly amounts and must be in an amount sufficient to provide adequate protection to the secured creditor.[16] This third requirement is designed to protect the secured creditor from any

---

[12]*Id.* at § 1325(a)(5)(B)(ii).

[13]*Id.* at § 1325(a)(5)(B)(I).

[14]*Id.* at § 1325(a)(5)(B)(ii).

[15]*Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). The Supreme Court expressly rejected the use of the contract rate of interest to satisfy the present value requirement in a Chapter 13 plan. This Court has, pre-BAPCPA, typically held that while the Trustee's discount rate is presumed to be an appropriate rate under *Till*, any party can rebut that presumption with evidence that a different rate is more appropriate under the unique facts of each case. Because Debtors propose to pay the *Till* rate that the Chapter 13 Trustee typically uses in cases in this Division (3% over prime), and because UAC does not object to that interest rate, the Court does not here decide what interest, if any, is now required as a result of the language contained in the "hanging paragraph." Because this partially secured creditor has "accepted" that portion of Debtors' plan, which is one of the methods for a debtor to obtain confirmation pursuant to § 1325(a)(5)(A), the interest rate issue is not ripe, and the Court will wait until the issue is raised, briefed and argued by the respective parties in interest.

[16]11 U.S.C. § 1325(a)(5)(B)(iii).

decrease in the value of its collateral during the life of the Chapter 13 plan.[17] UAC does not complain that any of these requirements have not been met in this case; its sole objection is to the amount of its secured claim.

Before the enactment of BAPCPA, secured creditors' claims could be bifurcated into secured and unsecured portions, depending on the value of the collateral securing the debt. The accepted vernacular for such bifurcated claims was that the claim was "crammed-down" to the value of the collateral, and that secured value was required to be paid over the life of the Chapter 13 plan with interest at the rate mandated by the Supreme Court's decision in *Till*.[18] Notably, BAPCPA made no changes to the language requiring that the secured creditor receive the present value of its claim in § 1325(a)(5)(B)(ii).

BAPCPA opted to differentiate between the treatment required for creditors who loaned money for a debtor to purchase a motor vehicle, for personal use,[19] within 910 days preceding the filing date, and other creditors. It did so by inserting an unnumbered paragraph at the end of § 1325(a)(9), which clearly appears not to be a part of—or even related to subsection (9) (which conditions confirmation on debtor's compliance with the duty to file required tax returns), but instead appears related to § 1325(a)(5). The hanging paragraph states, in pertinent part, as follows:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the

---

[17] *In re Fleming,* 339 B.R. 716, 720 (Bankr. E.D. Mo. 2006) (outlining requirements for confirmation, post-BAPCPA, and ultimately holding that anti-cramdown provision of BAPCPA does not require payment of interest at contract rate, but instead at *Till* rate).

[18] 541 U.S. at 484-85 (adopting formula approach, requiring adjustment of prime national interest rate based on risk of nonpayment).

[19] Although what constitutes "personal use" is an issue that this Court will soon be required to decide, in light of several pending cases where treatment of 910-cars purchased for a non-debtor spouse is at issue, because Debtors admit here that the Intrepid was acquired for their personal use, that potential question is also not decided here.

subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in Section 30102 of title 49) acquired for the personal use of the debtor....”

The applicable subsection of § 506 is, of course, § 506(a)(1), which provides that “[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor’s interest in the estate’s interest in such property....”

Accordingly, the language contained within the hanging paragraph makes the value of the collateral irrelevant in determining the allowed amount of a claim secured by a purchase money security interest in a vehicle acquired within 910 days of the bankruptcy filing. And unless the amount of the claim is subject to reduction for reasons other than collateral value, the creditor's allowed secured claim is fixed at the amount of the underlying debt under nonbankruptcy law.[20]

As a result, this Court cannot confirm a plan that attempts to cram down the claim of a creditor that extended credit to a debtor for the express purpose of purchasing a vehicle for debtor’s personal use when that purchase occurred within two and one-half years of the date of filing. Here, Debtors argue they are not trying to cram down that part of UAC’s claim that is represented by the purchase price of the vehicle purchased within that time period. Their plan proposes to pay the full purchase price of that vehicle, plus interest over the life of that plan. Instead, what Debtors’ plan attempts to do is to surrender a vehicle that played no part in the second transaction, and to treat the balance due on the first loan that was previously secured by that vehicle as satisfied by the surrender.[21]

---

[20]*In re Ezell*, 338 B.R. 330, 340 (Bankr. E.D. Tenn. 2006) (generally holding that if debtor elects to surrender vehicle obtained within 910 days of filing bankruptcy, surrender is deemed to fully satisfy creditor’s claim because anti-cramdown provision works both ways, and thus creditor retains no deficiency to assert as an unsecured claim).

[21]What the plan actually says is that “Debtors are willing to surrender [the Kia] to the creditor.” In later text, the plan then states that “**ANY PROPERTY SURRENDERED BY THE DEBTOR MEANS THE CREDITOR IS RESPONSIBLE FOR PICKING UP THE PROPERTY FROM THE DEBTOR.** Non exempt property which is

Conversely, UAC claims it did not even have a lien on the Kia at the time of the bankruptcy filing,[22] and that Debtors are barred from bifurcating its claim into secured and unsecured portions as a result of the new language in §1325(a) (the "hanging paragraph").[23] It thus apparently argues that its entire claim must be treated as if it were secured by a PMSI in the 1996 Intrepid, when in fact only $6,764 of the $8,789.98 loan was used to purchase new collateral. The Court holds that the statutory language does not support UAC's argument.

The first sentence of the "hanging paragraph" specifically states that "[f]or purposes of paragraph (5) [of §1325(a)], section 506 shall not apply to a claim described in that paragraph <u>if the</u>

---

of minimal value and would not be administered by a Chapter 7 case will be retained by the debtor and no additional amount will be paid to unsecured creditors for such property." Doc. 2 (emphasis in original). The impact of this dispute is only on the issue of whether UAC ends up with an unsecured claim of $2123, or ends up with no unsecured claim at all, since Debtor argues that surrender of the Kia fully satisfies the unsecured claim, if any. Since this appears to be a zero percent plan, this dispute is more hypothetical than real in its financial impact on either party. Debtors would pay no more into the plan, if UAC was found to have an unsecured deficiency claim, and UAC would receive no more from the plan if it were found to have an unsecured claim.

[22]Debtors' Schedule C does not exempt the Kia, UAC asserts it has no lien on this vehicle, and prior to the bankruptcy filing, UAC had deemed the underlying note on that Kia satisfied. Accordingly, it appears the Kia should be liquidated for distribution to unsecured creditors (assuming its value is not de minimis), or Debtors could elect to retain it and pay its value into the estate, since it appears no creditor claims a security interest in this non-exempt vehicle. Very generally speaking, a security interest is terminated when the underlying obligation is extinguished (assuming the original note did not contain an after-acquired property clause or the parties don't otherwise manifest an intention for the security interest to secure other debt (and UAC does not here so argue). *Compare In re Tulsa Indus. Facilities, Inc.*, 186 B.R. 517, 520 (Bankr. N.D. Okla. 1995) (holding future advance clause in security agreement survived after creditor paid off underlying debt), *In re Gibson*, 16 B.R. 257, 263 (Bankr. D. Kan. 1981) (holding that original note and security interest are not extinguished unless the parties manifest such an intention), and *Allis-Chalmers Credit Corp. v. Cheney Investment, Inc.,* 227 Kan. 4 (1980) (holding that second consolidating note did not extinguish first note). Thus, under these facts, UAC's security interest was effectively terminated when the underlying note was deemed paid.

[23]It is curious that UAC chose to release its lien on the Kia, in light of the provisions of the new 910-day BAPCPA changes. The Kia, like the Intrepid, was purchased within 910 days of the filing of this bankruptcy, so had UAC merely elected to retain its lien on the Kia, it certainly appears that Debtor would have been required to pay the full balance remaining due on that note, regardless of the value of that collateral, unless Debtor opted to surrender that collateral (which it is admittedly trying to do here). Similarly, the note on the Kia appears to contain a clause pledging the collateral for future advances, and UAC may also have had an argument that it retained an interest in the Kia after extinguishment of the note. Since it purposely chose to extinguish its lien pre-petition (whether its intent was effectuated pre-petition or not, as the parties dispute), it apparently elected not to retain any interest in the Kia. These choices were likely impacted by the poor condition and scrap value of the Kia.

creditor has a purchase money security interest securing the debt that is the subject of the claim..."[24] Whether a creditor has a purchase money security interest securing a debt is a matter of state law;[25] the law of the state of Kansas is, therefore, applicable here, since the stipulated documents show the transaction occurred in Topeka, Kansas.

Revised § 9-103(b) of the Uniform Commercial Code, as adopted and modified in Kansas, defines a "purchase-money obligation" as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."[26] In other words, to have a PMSI, an otherwise secured party has the burden of proof[27] to satisfy two key elements: 1) that the money loaned or credit extended made it possible for the debtor to obtain the collateral, and 2) that debtor used the funds supplied to acquire rights in the collateral. A security interest in collateral may be both a purchase money security interest and a non-purchase money security interest.[28]

UAC has not, and cannot, show, as it must to meet its burden on the first element, that the entire $8,789.98 loaned in 2005 made it possible for the debtor to purchase the 1996 Intrepid. Clearly, only $6,763.98 was loaned for that purpose. Furthermore, UAC has not, and cannot, meet its second burden to show that Debtors used the entire $8,789.98 loaned to acquire rights in the

---

[24]Section 1325(a) (emphasis added).

[25] *In re Billings*, 838 F.2d 405 (10th Cir.1988) (holding courts must look to the law of the state in which the security interest was created to determine if creditor retains status as a purchase money security interest despite refinancing) and *In re Horn,* 338 B.R. 110, 113 (Bankr. M.D. Ala. 2006).

[26]K.S.A. 84-9-103 (2001).

[27]A secured party claiming a purchase-money security interest has the burden of establishing the extent to which the security interest is a purchase-money security interest. K.S.A. 84-9-103(g).

[28]Keith G. Meyer, *A Primer on Purchase Money Security Interests Under Revised Article 9 of the Uniform Commercial Code*, 50 U. Kan. L. Rev. 143, 156 (2001) (providing a thorough explanation of the dual-status doctrine and the transformation rule, discussed below); *In re Gibson*, 16 B.R. at 267.

Intrepid. The documents attached to UAC's claim make it clear that the extent of UAC's purchase money security interest in the Intrepid is limited to the purchase price of that vehicle, plus any interest that has accrued on the purchase price, minus any payments that may have been received on the loan.

UAC decided it was not going to retain its lien on the Kia, and the Court will enforce that intent.[29] Because UAC purposely deemed the first note paid by noting it had been paid in full, because UAC claims it has no interest in the Kia, as a result of its position that it released its lien pre-petition, and because the parties obviously intended that the Kia not be collateral for the new note, the Court finds that UAC's security interest in the Kia was extinguished pre-petition. Thus, the excess $2,123 in the second note is an unsecured antecedent debt, which is not entitled to purchase-money treatment under § 1325(a).

Accordingly, because Debtors' plan proposes to pay the full PMSI-portion of the second note, it does not run afoul of the anti-bifurcation provision contained in the hanging paragraph. Had

---

[29]Before this issue was put to rest by the Kansas legislature's 2001 revision to its version of the Uniform Commercial Code, courts in the Tenth Circuit had frequently held that a determination of all the facts was required in order to decide whether a security interest lost its purchase money status if the collateral secured more than its price, or if the loan was refinanced with the infusion of some new proceeds. *See, e.g., In re Johnson*, 101 B.R. 280 (Bankr. W.D. Okla. 1989), *citing In re Billings*, 838 F.2d 405 (10th Cir.1988) (rejecting the "transformation rule," which essentially demotes a PMSI in consumer goods to non-PMSI status if the collateral secures more than its price, or if loan is refinanced with infusion of new proceeds). This matter has now been settled by the Kansas legislature's decision to statutorily reject certain parts of the revised § 9-103 of Article 9 adopted by the National Conference of Commissioners on Uniform State Laws (NCCUSL). It is thus now clear that in Kansas, the dual-status rule applies in both commercial and consumer contexts, meaning that a creditor's purchase money status is not lost merely because of a refinancing or infusion of new proceeds. Thus a security interest in goods is a PMSI to the extent that the goods are purchase-money collateral, and non-PMSI as to the remainder. The legislature effectuated this by deleting the "consumer-goods transaction" phrase from subsections (e), (f) and (g) of K.S.A. 84-9-103, and by declining to adopt subsection (h),which generally leaves courts free to continue to apply established approaches in determining whether a security interest loses its PMSI status in consumer-goods transactions. *See,* Christopher Harry, Comment, *To be (Transformed), or Not to Be: The Transformation Versus Dual-Status Rules for Purchase-Money Security Interests Under Kansas' Former and Revised Article 9*, 50 U. Kan. L. Rev. 1095, 1122 (2002).

Debtors proposed a plan that only paid, as secured, the $3,600 they claim the Intrepid is worth, this would have violated the anti-bifurcation language, but that is not what this plan proposes to do.

**IV. Conclusion**

Debtors' Chapter 13 plan meets the provisions of 11 U.S.C. § 1325(a) in providing full payment of that portion of UAC's claim representing its purchase money security interest in the 1996 Intrepid, with interest. The Debtors should amend their plan, however, to remove the reference to being "willing to surrender" the Kia to UAC, since UAC admits it no longer has a security interest in that vehicle. They should indicate what they intend to do with that vehicle, if anything.

There remains pending UAC's Motion for Relief from Stay[30] and Debtors' Objection to UAC's Proof of Claim.[31] As to UAC's Motion for Relief from Stay, the Court will set that matter for argument on the confirmation docket, already set for **June 26, 2006 at 1:30 p.m.** If UAC contends that its security interest in the 1996 Intrepid, as the Court has defined it herein, is still not adequately protected by the provisions of the Chapter 13 plan (i.e., that the monthly payment of $230 provided in the plan does not provide it adequate protection), the Court will hear argument on that matter. If UAC believes the plan adequately protects its interest in the Intrepid, in light of this decision, it may elect to withdraw its Motion for Relief from Stay.

As to Debtors' Objection to UAC's claim, the Court finds, in accordance with this opinion, that UAC has a secured claim in the amount set forth in Debtors' plan, $6,764, plus any pre-petition interest that accrued prior to the filing of the bankruptcy, and an unsecured claim in the amount of $2,123, plus any interest on that amount that accrued pre-petition, if any. The Court requests that

---

[30]Doc. 21.

[31]Doc. 35.

UAC file an amended claim so that these calculations can be made for the benefit of the Court and the Trustee.

**IT IS, THEREFORE, ORDERED,** that Universal Acceptance Corporation's Objection to Confirmation is overruled in part, and sustained, in part. The Court sustains only that part of UAC's objection concerning Debtors' potential surrender of the Kia automobile to UAC, since it holds that UAC had no interest in the collateral at the time Debtors filed their bankruptcy petition; the rest of UAC's objection is overruled. The Court also finds that Debtors' Objection to UAC's claim is sustained to the extent it objects to payment of the non-purchase money portion of the December 2005 note as secured; those amounts will be treated as an unsecured claim because UAC forfeited its interest in the collateral prior to the filing of the petition.

###